# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

AARON BILBREY,                          :

      Plaintiff,                     :

                                  Case No. 3:13cv00010

vs.                                     :

                                  District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                      :      Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                :

      Defendant.                     :

_____

## REPORT AND RECOMMENDATIONS[1]

_____

## I.    <u>Introduction</u>

Aaron Bilbrey suffers from back pain due to spinal stenosis and degenerative disc

disease in his lumbar spine. He is 5'11" tall, his weight fluctuates well within the range of

obesity, and he has right-knee pain as well as diabetes (Type II). At age 18, in 1990, Bilbrey

underwent back surgery. He recovered enough to initially return to work. But over the years,

his back problems became (in his words) "progressively worse," and it seemed to him that

he would "throw [his] back out ... once every two to three months...." (Doc. #6, PageID at

51).

In May 2009, Bilbrey applied for Disability Insurance Benefits and Supplemental

_____

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

Security Income, asserting that he had been under a benefits-qualifying disability since March 5, 2009. (Doc. #6, PageID at 90). After an evidentiary hearing, Administrative Law Judge Edward D. Steinman concluded otherwise and denied Bilbrey's applications. On appeal, the Social Security Administration stuck with ALJ Steinman's non-disability decision.

Bilbrey now brings the present case challenging ALJ Steinman's non-disability decision due to his failure to (1) properly evaluate the medical sources' opinions and (2) properly consider all of Bilbrey's impairments and their combined impact on his work abilities. The case is pending upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record (Doc. #6), and the record as a whole.

Bilbrey asks the Court to reverse the ALJ's decision and remand for payment of disability benefits or, alternatively, to vacate the ALJ's decision and remand for further proceedings. The Commissioner seeks an Order affirming the ALJ's non-disability decision.

The Court has jurisdiction over this matter. *See* 42 U.S.C. §§405(g), 1383(c)(3).

## II.  <u>"Disability" Defined</u>

To be eligible for Disability Insurance Benefits or Supplemental Security Income a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). "Disability" is defined essentially the same for both types of benefits. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). A "disability"

2

consists only of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.[2] *See Bowen*, 476 U.S. at 469-70.

The applicant for benefits bears the ultimate burden of establishing that he or she is under a disability. *Ferguson v. Comm'r of Social Sec.*, 628 F.3d 269, 275 (6th Cir. 2010); *see Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).

## III.   Background

### A.   Bilbrey's Vocational Profile and Testimony

Bilbrey was 38 years old on the date he asserts his disability began. He was therefore considered to be a "younger person" under Social Security regulations. 20 C.F.R. §§404.1563(c); 416.963(c).[3] In 1997, Bilbrey earned a Bachelor of Arts degree (in "Art") and has not had additional specialized job training. (Doc. #6, PageID at 168-69, 230). He worked in the past as a cashier, telephone operator, and telephone salesperson.

During the administrative hearing, ALJ Steinman asked Bilbrey why he had not been able to work since March of 2009. Bilbrey testified that, in addition to his worsening back problems, the prescription medication he takes makes him "extremely groggy." (Doc. #6,

---

[2] The impairment must also be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423, 1382c(a)(3).

[3] The remaining citations will identify the regulations pertinent to Disability Insurance Benefits with full knowledge of the corresponding regulations pertinent to Supplemental Security Income.

PageID at 51). He explained, "Sometimes it makes me sleepless at night to where I can't sleep, and then during the day I'll find myself nodding off at seriously inappropriate times[,] and when I do throw my back out he [my doctor] gives me an even stronger medication that, it just makes that even more distinct, to where I'm groggy half of the day, it seems like." *Id*. Bilbrey's medications include Lisinoprol (for high blood pressure), Glucophage (for diabetes), and Flexeral (muscle relaxant). To treat his pain, he takes Vicodin. *Id*. When he throws his back out, his physician prescribes Percocet, a strong pain medication containing Oxycodone, a narcotic "used to relieve moderate to severe pain." http://www.nlm.nih.gov (search: MedlinePlus database under "Drugs & Supplements").

Bilbrey explained that anything could cause his back to "throw out":

> Usually it's just a movement that I would have never even predicted would throw my back out. A simple bending over to pick something up or maybe just twisting wrong while laying [sic] in bed and I wake up with the problem. But when I wake up I can barely even get myself to stand up without some sort of assistance and the pain is excrutiating, starting in my lower back and radiating down my legs. And it causes me to walk even more hunched over that I normally do and I definitely – that is the one point where I use a cane around the house because I can't even walk from one room to the other without some sort of support when that happens.

(Doc. #6, PageID at 57). When Bilbrey's pain flares up, it lasts about a 1½ to 2 weeks.  He feels "pretty sharp pain" in his lower back and the pain extends down his buttocks and the back of his thighs. "It is a sort of radiating pain .... There also seems to be a dull ache in [his] back, too, most of the time."  *Id*., PageID at 58. He also experiences numbness in his thighs, hips, and feet (sometimes). *Id*., PageID at 58. When his back pain flares up, he does not

4

leave his home, except to go to his doctor's office. (Doc. #6, PageID at 59). He estimated that his pain levels are 9, on a pain scale of 1 to 10 (1 equaling no pain; 10 equaling unbearable pain). *Id*., PageID at 61.  His physician wants him to see an orthopedist and have additional testing done, but he cannot not afford it.

Bilbrey has had right-knee pain since 2001, after he slipped on ice. He testified that his leg was put in a cast from his ankle to his waist. He wore the cast for a month and after his cast was removed, he remained incapacitated for three months. *Id*., PageID at 53. He testified that the muscle in his lower-right leg has atrophied and he has "no step in that leg." *Id*., PageID at 60. He cannot stand on his tiptoes, cannot push off his right leg, and cannot get down on his "knees for anything ...." *Id*. When he sits or stands he "can just hear the crackling and popping in [his] knee ...."  *Id*. A couple of times a month, his knee will "pop out of place," causing him to fall. *Id*.

Bilbrey estimated that he could lift and carry 10 or maybe 15 pounds during an 8-hour workday. Doing this, however, makes him feel like he is at risk for throwing his back out. When he has back pain flares up, he does not try to lift anything heavier than a pencil. *Id*., PageID at 59. Bilbrey could sit comfortably for about one-half hour, and he could stand and walk for 15 minutes, with the assistance of his cane (or a shopping cart). *Id*., PageID at 55.

When the ALJ asked Bilbrey about what he did to occupy his time, he answered, "I've been writing a book and actually I just finished writing it and I'm in the process of having some people proofread it before I send it out to publishers." *Id*., PageID at 56. He is

writing a novel. He spent four to five hours per day writing it, sometimes using a computer. (Doc. #6, PageID at 56). He noted, "I will also use a notebook if I'm uncomfortable sitting at the computer – I'll just either lay [sic] down or just get comfortable and write in my notebook [an actual paper notebook; not a computer notebook]." *Id*. When his back pain flares up, he has worked "somewhat" on his book but his prescription medications "makes [him] not think as clearly at that point...," so he will often "wait until it's passed." *Id*., PageID at 58.

Bilbrey has a driver's license and drives about three days a week for "about an hour at a time." *Id*., PageID at 54. He goes to the post office or "to pick up a bite to eat .... That's pretty much it." *Id*. He can feed, clothe, and wash himself. He cooks little because he cannot stand for more than 10 minutes; he typically does not stand for more than 5 minutes while inside his home.

### B.     Medical Source Opinions

Review of the medical source opinions in chronological order begins with Dr. Danopulos, who examined Bilbrey in June 2009 for the Ohio Bureau of Disability Determinations. At that time, Bilbrey was 37 years old. Dr. Danopulos observed that Bilbrey "presents as a well-developed overweight [C]aucasian male of about stated age.... His mental status was normal. His behavior was normal. He was noted to move in the examination room freely. His remaining movements were normal." (Doc. #6, PageID at 256).

6

Dr. Danopulos summarized his examination as follows:

[Bilbrey] gave a history of spinal stenosis which was operated when he was eighteen yours old. He continues to experience low back pain, though he stated that he benefitted from the laminectomy which was done at that time. On clinical examination, spine was painful in the mid-dorsal spine area and in the mid-lumbar spine area. Straight leg raising was normal. Lumbar spine motions were restricted and painful. The lumbar spine X-rays revealed evidence of previous extensive laminectomy for spinal stenosis plus fusion surgery with evidence of degenerative disc disease.

His complaints of right knee pain were documented as follows. Right knee revealed painful and restricted motions. The restricted motions were almost equal in both knees and no unilateral knee swelling existed. According to reports that he had in his chart, he had an MRI of his right knee which showed a complete medial collateral ligament injury, a complete ACL injury, posterior subluxation of the tibia compatible with at least partial cruciate ligament injury, and this was dated January 23, 2001. It seems that since then he has improved considerably. The right knee X-rays revealed mild to moderate degeneration of the tibiofemoral joint plus partial dislocation of the patella laterally.

* * *

His blood pressure was 165/95 mm/Hg. He showed borderline systolic hypertension.

His weight was 322 pounds versus a height of 69 1/4." He suffers from morbid obesity.

The objective findings were: 1) lumbar spinal stenosis, undergone a laminectomy plus fusion almost nineteen years ago, with current chronic pain due to arthritic changes, 2) right knee chronic pain, 3) mature onset, well controlled diabetes, 4) poorly controlled hypertension, and 5) morbid obesity.

His ability to do any work-related activities is affected and restricted from the combination of his morbid obesity plus his right knee ACL injury which continues to trigger right knee pain when he is on his feet for five minutes, plus his lumbar spine status post laminectomy and fusion with chronic pain. His systolic, poorly controlled blood pressure, is another burden to him.

7

(Doc. #6, PageID at 258-59).

In July 2009, Dr. McCloud reviewed the record and provided his opinions by completing a form. *Id*., PageID at 352-59. He opined that Bilbrey could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk at least 2 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. Dr. McCloud explained, in part, that Bilbrey's gait was normal without ambulatory aids. His mid-lumbar spine was painful to pressure, and he had reduced range of motion in h is lumbar spine. Bilateral straight-leg raising was normal. "Squatting elicited right knee pain," and he had painful and restricted range of motion in his right knee." *Id*., PageID at 353. "Strength was 5/5 throughout." *Id*.

Dr. McCloud explained further:

> [Bilbrey] did not have any neurological deficits. X-rays or the L-spine revealed extensive previous surgery for spinal stenosis plus fusion and some disc space narrowing as evidence of DDD [degenerative disc disease]. X-rays of his right knee showed mild to moderate degenerative changes of the tibiofemoral joint and partial dislocation of the patella laterally. No knee swelling on exam. BP: 155/95. Poor control with no evidence of severe EOD [end-organ damage]. Well controlled diabetes without evidence of any severe EOD. Standing and walking limited to 2 hours in an eight hour workday.

*Id*., PageID at 353-54. Dr. McCloud concluded that Bilbrey's symptoms were attributed to a medically determinable impairment, that the severity or duration of the symptoms was "not disproportionate to the expected severity or duration on the basis of [his] claimant's medically determinable impairment." *Id*., PageID at 357. And Dr. McCloud found that Bilbrey's "alleged limitations appear generally credible." *Id*.

Bilbrey's longtime treating physician, Dr. Timpone, completed two questionnaires. In

8

the first, in September 2009, Dr. Timpone reported that Bilbrey had poor range of motion in his lower back, right knee, and left ankle; he could not stand on his tiptoes or right knee alone; and he had motor loss in his right knee and foot, along with an antalgic gait favoring his right knee. (Doc. #6, PageID at 361).

In September 2010, Dr. Timpone filled out a second questionnaire. He opined that Bilbrey could stand for 15 minutes at one time, sit for 30 minutes, occasionally lift 10 pounds, and frequently lift 5 pounds. Dr. Timpone's most recent exam of Bilbrey revealed poor range of motion, 20 %, in his lumbosacral spine with "severe deconditioning," tender L5-S1, positive straight-leg raising, poor range of motion and decreased motor functioning in his right knee. *Id*., PageID at 374.

Given the opportunity to rate Bilbrey's pain on a broad scale – none, mild, moderate, severe, extreme – Dr. Timpone believed that Bilbrey's pain was "moderate." *Id*., PageID at 375.  Dr. Timpone concluded that Bilbrey could never bend or stoop; could occasionally balance; occasionally needs to elevate his legs during an 8-hour workday; and frequently needs to ice his knees during an 8-hour workday. And Dr. Timpone concluded, "combination of problems currently precludes most work and affects [activities of daily living] moderately. Part-time sedentary work following full rehab may be possible." *Id*., PageID at 375.

In November 2009, Dr. Klyop reviewed the record and concluded that Dr. Timpone's opinions "cannot be given weight because he gave no statement of limitations. [Bilbrey's]

9

allegations are credible." (Doc. #6, PageID at 362). Dr. Klyop affirmed Dr. McCloud's opinion "as written." *Id*.; *see* PageID at 352-59.

In March 2011, Dr. Brahms testified during the ALJ's hearing about his review of the record. Dr. Brahms is a board certified orthopedic surgeon. *Id*., PageID at 132. He believed that Bilbrey was "capable almost of performing medium work. I suggest that we consider light work with the following restrictions: I think he ought to avoid stairs, ladders, scaffolds, ropes.... Occasionally kneeling and stooping but no crawling. He's to avoid heights and hazardous machinery. He can lift below the waist level only occasionally." (Doc. #6, PageID at 62-63). According to Dr. Brahms, Bilbrey could lift up to 20 pounds occasionally below his waist level and frequently above his waist level. *Id*., PageID at 63.

Dr. Brahms disagreed with Dr. Timpone's assessment that Bilbrey could do less than full-time work. He reasoned that the treating notes did not support Dr. Timpone's assessment. *Id*.

Reviewing the March 2011 MRI of Bilbrey's right knee, Dr. Brahms acknowledged that Bilbrey "may well have torn his ACL, may have torn his collateral ligament, but it's very unlikely that a dislocation occurred." *Id*., PageID at 65. Dr. Brahms further testified that the March 2011 MRI showed "some evidence of arthritic changes in his knee, and that may well cause him some discomfort. But certainly because of his diabetic status and his obesity there is no question in my mind that his knee problem will be of much concern at a future date." *Id*., PageID at 66. Dr. Brahms categorized Bilbrey as "very morbidly obese." *Id*.,

10

PageID at 62. And he testified that Bilbrey's morbid obesity and diabetes would exacerbate his back and knee impairments. (Doc. #6, PageID at 67).

> Dr. Brahms opined about Bilbrey's back as follows:
>
> One doesn't question that the fact that he may have low back problems occasionally. There's no question – one could not question that in view of the fact again we're talking about a very obese individual who has had a problem with his back in the past and he is likely to have concerns for a long period of time principally again, I can't emphasize it enough, his diabetic status and his obesity.

*Id*., PageID at 67. Dr. Brahms acknowledged that Bilbrey had back surgery "at the age of 15 or 18..., and he does have evidences [sic] of some foraminal narrowing, but there's no obvious evidences [sic] of any recurrent herniated disc." *Id*., PageID at 62.

### C.   Other Medical Evidence

A physician reported in 2001 that Bilbrey underwent a right-knee MRI, revealing "a complete medial collateral ligament injury, a complete ACL injury. Posterior subluxation of the tibia is seen that is compatible with an at least partial posterior cruciate ligament injury." (Doc. #6, PageID at 349). The physician noted that he had contacted Dr. Timpone and "explained at length the very serious nature of Mr. Bilbrey's injury, and that the severity is compounded by his obesity. He [Bilbrey] is, at present weight, not a surgical candidate, as he is at very high risk for complications ...." *Id*., PageID at 350. Bilbrey was treated by immobilizing his leg in a cast for an initial period of three to four weeks, and he was instructed to perform straight-leg raising with his father's help. *Id*.

A report in June 2006 showed that Bilbrey had a "[n]ormal left foot" with a small

calcaneal spur. *Id.*, PageID at 339.

A June 2009 radiology report concerning Bilbrey's lumbar spine explained, "The patient has had removal of the spinous processes from L3 through L1 because of spinal stenosis. Extension fusion of the posterior elements is noted. There is disc space narrowing at T12-L1, L1-L2, and L2-L3." (Doc. #6, PageID at 260). The impression: "Extensive previous surgery is noted and some disc space narrowing suggesting degenerative disc disease." *Id.* As to his right-knee patella, it "is not midline. It is off to the lateral side indicating a partial disc location." *Id.* The impression: "Mild to moderate degeneration of tibiofemoral joint and at least partial dislocation of the patella laterally." *Id.*

The most recent medical test results in the record appear in a March 2011 MRI report issued before the ALJ's April 2011 non-disability decision. The March MRI report focuses on Bilbrey's lumbar spine. The report states, in part:

> There is loss of normal disc signal and disc height throughout the thoracolumbar spine through L5 consistent with advanced degenerative disease. L5-S1 disc is preserved. Decompressive laminectomy L2 through L5 levels is identified. Lumbar facet arthropathy is noted. No spondylosis is appreciated. No degenerative anterolisthesis is seen. Minimal L2-L3, L3-L4, L4-L5 degenerative retrolisthesis is seen without anterolisthesis.

*Id.*, PageID at 381. The MRI showed spinal stenosis at L1-L2 and at least mild to moderate facet arthropathy with resulting mild to moderate central and lateral recess stenosis. *Id.* At Bilbrey's L2-L5 levels, the MRI revealed, "posterior decompressive laminectomy with post-contrast images demonstrating ventral and lateral recess epidural fibrosis with no recurrent or residual disc disease with no central nerve compromise." *Id.*, PageID at 381. A physician

12

provided two impressions: "1. Postoperative findings L2-L5 with no recurrent or residual disease identified or definitive central nerve root compromise seen with epidural fibrosis demonstrated on post-contrast images. 2. Bilateral L3-L4 and L4-L5 mild-to-moderate foraminal stenosis. No definitive exiting nerve compromise." (Doc., PageID at 381-82).

Bilbrey also underwent an MRI of his right knee in March 2011. The resulting impressions were "1. Small joint effusion. 2. There is a 6 mm of cartilaginous loose body within the infrapatellar fossa. 3. Mild lateral patellar tilt. 4. Grade 4 chondromalacia patellae with joint space narrowing and osteophyte formation." *Id*., PageID at 384.

## IV.   ALJ Steinman's Sequential Evaluation

ALJ Steinman resolved Bilbrey's disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations. *Id.,* PageID at 90-100; *also* 20 C.F.R. § 404.1520(a)(4). His pertinent findings began at Step 2 where he concluded that severe impairments included "lumbar degenerative disease of the lumbar spine, knee pain and obesity." *Id*., PageID at 92.

The ALJ concluded at Step 3 that Bilbrey did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner Listing of Impairments. *Id*., PageID at 94.

At Step 4, the ALJ assessed Bilbrey's residual functional capacity as follows:

[T]he claimant has the residual functional capacity[4] to lift and carry 20

_____

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v.*

pounds occasionally and 10 pounds frequently, stand and/or walk for about 6
hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday
with a sit/stand option. The claimant should avoid stairs, ladders, ropes and
scaffolds. He can occasionally kneel and stoop but cannot crawl. He must
avoid heights and hazardous machinery. He can lift below waist level only
occasionally but he can lift above waive level frequently.

(Doc. #6, PageID at 94)(footnote added). The ALJ further found at Step 4 that Bilbrey could

perform his "past relevant work as a telephone operator and [in] telephone sales." *Id*.,

PageID at 98.

At Step 5, the ALJ further concluded that Bilbrey could perform a significant number

of jobs in the national economy, including small parts assembler (light work), textile

assembler (light work), and optical lens assembler (sedentary work). *Id*., PageID at 99.

The ALJ's findings throughout his sequential evaluation led him to ultimately

conclude that Bilbrey was not under a disability and was therefore not eligible for DIB or

SSI.

## V. <u>Discussion</u>

### A. <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence." *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 406 (6th Cir.

2009); *see Bowen v. Comm'r. of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

The substantial-evidence review does not ask whether the Court agrees or

_____

*Commissioner of Social Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing the ALJ's legal criteria for correctness – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

### B.   Medical Source Opinions

Bilbrey contends that the ALJ failed to properly evaluate the opinions of his treating physician Dr. Timpone. Bilbrey reasons that the ALJ gave purported reasons but when the

record is viewed as a whole, "his justifications misconstrue the record. Taking into account the totality of the record, applying the rules and regulations properly, Dr. Timpone is entitled to controlling weight." (Doc. #7, PageID at 392).

The Commissioner argues that the ALJ provided good reasons for rejecting Dr. Timpone's opinions and that Bilbrey's challenges are nothing more than a disagreement about with how the ALJ decided to weigh differing medical opinions, "'which is clearly not a basis ... for setting aside the ALJ's factual findings." (Doc. #10, PageID at 429)(quoting *Mullins v. Sec'y of HHS*, 836 F.2d 980, 984 (6th Cir. 1987)).

Social Security Regulations recognize several different categories of medical sources: treating physicians and psychologists, nontreating yet examining physicians and psychologists, and nontreating yet record-reviewing physicians and psychologists. *Gayheart v. Comm'r of Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1)).

A treating source's opinion may be given controlling weight under the treating-physician rule only if it is both well supported by medically acceptable data and not

16

inconsistent with other substantial evidence of record. *Id*. at 376 (citing 20 C.F.R. §404.1527(c)(2)). "If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

Unlike treating physicians, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id*. (citing 20 C.F.R. §404.1527(c)(6)).

ALJ Steinman rejected Dr. Timpone's opinions as follows:

The opinions of this doctor appears on a fill-in-the-blank form, with no notes attached to it. The doctor failed to cite any medical testing results to support his conclusions as to the claimant's residual functional capacity. There is no indication that the doctor ever saw or ordered an X-ray or MRI in order to determine the nature of the claimant's impairment or to enable him to ascertain the resulting limitations he imposed. The objective evidence in the record does not support the level of severity that this doctor assigns. As noted by Dr. Brahms, the MRI of knee and back shows early arthritis (knee) and some foraminal narrowing (back). Dr. Brahms is the orthopedic expert while Dr. Timpone is a primary care physician. Moreover, the doctor's opinion contrasts sharply with the other evidence in the record, which renders it less persuasive. Dr. Timpone's assessment is based in part on his statement that claimant's straight leg raising test was positive. However, the doctor's own records indicate that upon examination, the claimant's straight leg raising was negative

17

(Exhibit 6F/6, 12) [(Doc. #6, PageID at 329, 334)]. The undersigned gives Dr. Timpone's opinions little weight.

(Doc. #6, PageID at 97).

An ALJ must give good reasons for declining to give controlling weight to a treating source's opinions. *See Wilson* 378 F.3d at 544-45; *see also* 20 CFR §404.1527(c)(2). The ALJ did provide reasons for applying little weight to Dr. Timpone's opinions. But, substantial evidence does not support the ALJ's reasons. The ALJ's first reason for declining to give Dr. Timpone controlling weight is that the questionnaire is a fill-in-the-blank form, and no notes are attached to it. Dr. Timpone, however, submitted his extensive treatment notes spanning over 11 years. (Doc. #6, PageID at 266-351, 363-73, 376-80). The ALJ's negative slant on the "fill-in-the-blank" form focused too much on its appearance at the expense of overlooking the substance of the opinions and supporting information Dr. Timpone provided. The substantive information Dr. Timpone provided focused on Bilbrey's work limitations, including his limitation to 15 minutes of standing at one time, 30 minutes of sitting at one time, 2 hours of work per day, and sedentary lifting. *Id*., PageID at 374. Dr. Timpone also believed that Bilbrey might be able to perform part-time sedentary work but only after full rehabilitation.  *Id*., PageID at 375. In support of these opinions, Dr. Timpone listed Bilbrey's diagnoses, his symptoms, and his pertinent medical history.  And Dr. Timpone reported the findings of his most recent examination of Bilbrey: poor range of motion (20%) in his lumbosacral spine with severe deconditioning, tenderness in his L5-SI joint, positive straight-leg-raising test, poor range of motion in his right knee, and he

18

weighed 305 pounds. *Id.*, PageID at 374. Thus, in contrast to the ALJ's decision, Dr. Timpone provided valuable and specific information in support of his opinions. (Doc. #6, PageID at 266-351, 363-73, 374-80).

In addition, the ALJ's finding that Bilbrey had a negative straight-leg test is not supported by the information contained in the particular pages of the record he cites – specifically, Exhibit 6F/6, 12. *Id.*, PageID at 328, 334. This is not surprising because Exhibit 6F contains lab reports, rather than Dr. Timpone's treatment notes, and none of the lab reports in Exhibit 6F refer to a straight-leg-raising test. *Id.*, PageID at 323-34. The Commissioner fares better than the ALJ by pointing to other pages of the record indicating that Bilbrey had negative straight-leg-raising tests. *See* Doc. #10, PageID at 432 (citing PageID at 367, 374). The Commissioner, however, overlooks that still other pages of Dr. Timpone's treatment notes document positive straight-leg-raising tests. (Doc. #6, PageID at 364, 368 (positive left leg)). Most importantly, one positive straight-leg-raising test occurred in August 2010, just one month before Dr. Timpone's September 2010 opinions. *Id.*, PageID at 364. This particular test result directly supports Dr. Timpone's reference to a singular "positive st. leg raising <u>test</u>," as he wrote in his report. *Id.*, PageID at 371 (emphasis added). Thus, the ALJ erred by selecting only the evidence tending to support discounting Dr. Timpone's opinions while overlooking or ignoring probative evidence that supported Dr. Timpone's opinions. *Cf. Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports

19

his position."); *cf. also Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004)("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."); *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) ("we cannot uphold an administrative decision that fails to mention highly pertinent evidence...."); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002).

The ALJ's next reason for declining to give controlling weight to Dr. Timpone is that he never ordered a X-ray or a MRI. (Doc. #6, PageID at 97). This is incorrect. The record contains a MRI of Bilbrey's lumbar spine and a MRI of his right knee. The physician's report concerning each MRI establishes that Dr. Timpone was the "ordering physician." *Id*., PageID at 381-84.

Next, the ALJ pointed to Dr. Timpone's status as a primary-care physician, not an orthopedic specialist like Dr. Brahms. Although correct, "specialization" is merely one factor out of several the ALJ is to consider. 20 CFR § 404.1527(d). Indeed, "[i]f the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citation omitted). The ALJ's decision leaves the reader with little or no confidence that he applied some or any of the remaining factors when evaluating Dr. Timpone's opinions.

20

Because at least some of those factors supported the validity of Dr. Timpone's opinions, the ALJ needed to do more than rely on the single "specialization" factor. *Cf. Loza*, 219 F.3d at 393; *cf. also Robinson*, 366 F.3d at 1083; *Parker*, 597 F.3d at 921 ("we cannot uphold an administrative decision that fails to mention highly pertinent evidence...."); *Kuleszo,* 232 F.Supp.2d at 57. Indeed, Dr. Timpone had a long-term and substantial treatment relationship with Bilbrey. As of the date of Dr. Timpone's opinion, he had been treating Bilbrey for over ten years. (Doc. #6, PageID at 266-351, 363-73, 376-80). Dr. Timpone had seen Mr. Bilbrey almost sixty times. *Id*. In contrast, Dr. Brahms never saw or treated Bilbrey (he testified by phone at the hearing). The extensive and long-term history of Dr. Timpone's treating relationship with Bilbrey adds significantly better insight into his impairments, especially compared to Dr. Brahms' minimal exposure to, and non-treating relationship with, Bilbrey. Under these circumstances, the ALJ should have weighed Dr. Timpone's opinions under these factors. "To be sure, a properly balanced analysis might allow the Commissioner to ultimately defer more to the opinions of consultative doctors than to those of treating physicians. But the regulations do not allow the application of greater scrutiny to a treating-source opinion as a means to justify giving such an opinion little weight. Indeed, they call for just the opposite." *Gayheart*, 710 F.3d at 379-80 (internal citation omitted).

Dr. Timpone's treatment notes also tend to support his opinions. Before the alleged onset date of March 5, 2009, Dr. Timpone notes documented frequent complaints of pain supported by decreased range of motion of the lumbar spine and knees, deconditioning, and

weight between 300 and 400 lbs. (Doc. #6, PageID at 266-351, 363-73, 376-80). Treatment notes after the alleged onset date reflect the deterioration of Bilbrey's condition. On January 18, 2011, Dr. Timpone noted, "spinal disease persistent, stenosis, post-op pain, [and] a lot of weakness & atrophy." (Doc. #6, PageID at 377). Regarding Bilbrey's lumbosacral spine, Dr. Timpone found poor range of motion, spasm, tenderness, atrophy, and marked weakness. *Id*., PageID at 377. On August 4, 2010, the range of motion in Bilbrey's lumbosacral spine was 20 percent, his lumbosacral spine was "deconditioned severely," he was tender at L5-S1, and his straight-leg-raising test was positive. *Id*., PageID at 364. Bilbrey's right knee had reduced range of motion and his DTR (deep tendon reflexes) were also reduced. *Id*. On March 2, 2010, Dr. Timpone again noted that Bilbrey had reduced lumbosacral range of motion. Dr. Timpone also noted that Bilbrey had scoliosis and his lumbosacral spine was deconditioned and tender at L5-S1. *Id*., PageID at 367. On June 2, 2009, Dr. Timpone observed that Bilbrey was experiencing low back pain with "severely reduced function." *Id*., PageID at 372. Dr. Timpone believed that Bilbrey "may be disabled from any but very sedentary work." *Id*., PageID at 372. He also noted lumbosacral "spasm, deformity," and a reduced range of motion to 25 percent. *Id*.

Dr. Timpone's opinions are also consistent with some examination results found by Dr. Danopulos. *Id*., PageID at 254-64. Dr. Danopulos noted painful and restricted motions of Bilbrey's right knee. Although Dr. Danopulos observed that Bilbrey had a normal gait and a normal straight-leg-raising test, Dr. Timpone also found, "[o]n clinical examination, spine

was painful in the mid-dorsal spine area and in the mid-lumbar spine area." *Id.*, PageID at 258. The exam also revealed Bilbrey's dorsal kyphosis, knee pain upon squatting, weight of 322 pounds, and inability to perform toe-to-heel gait. *Id.*, PageID at 257-58. And Dr. Danopulos' testing showed that the range of motion in Bilbrey's dorsolumbar spine was reduced; his flexion was 70° (normal = 90°), extension was 0° (normal = 30°), and both right and left flexion was 15° (normal = 30°). (Doc. #6, PageID at 263). Dr. Danopulos found additional limitations in the range of motion in Bilbrey's hips, knees, and ankles. *Id.*, PageID at 264.

The MRI reports in March 2011 further support Dr. Timpone's opinions. The lumbar spine MRI shows loss of normal disc signal and disc height throughout the thoracolumbar spine through L5 consistent with advanced degenerative disease, decompressive laminectomy at L2-L5 levels, and lumbar facet arthropathy. *Id.*, PageID at 381-82. Bilbrey had spinal stenosis at L1-2 and at least mild to moderate facet arthropathy with resulting mild to moderate central and lateral recess stenosis. *Id.*, PageID at 381-82. His L2-5 levels revealed his posterior decompressive laminectomy, moderate bilateral foraminal stenosis at L2-3 and L5-S1. *Id.* The MRI of Bilbrey's right knee showed a small joint effusion, 6 mm of cartilaginous loose body within the infrapatellar fossa, mild lateral patellar tilt, and grade 4 chondromalacia patellae with joint space narrowing and osteophyte formation. *Id.*, PageID at 383-84. The ALJ also disregarded Dr. Danopulos' opinion because "It is not really an opinion at all because it imposes no specific limitations on (Bilbrey)." *Id.*, PageID at 97. But

23

Dr. Danopulos expressly opined that Bilbrey's ability to work was restricted by a combination of morbid obesity and his right knee injury, which is triggered when Mr. Bilbrey is on his feet for five minutes. *Id*., PageID at 254-64. Dr. Danopulos provided a clear picture of Mr. Bilbrey's functional limitations as a result of his obesity and knee pain. The ALJ instead adopted the opinion of Dr. Brahms who had never examined Bilbrey. (Doc. #6, PageID at 97-98). Again, this is scrutinizing an examining source more closely than a non-examining source, which is contrary to the Regulations. *See Gayheart*, 710 F.3d at 379-80.

Accordingly, for all the above reasons, Bilbrey's Statement of Errors is well taken.[5]

## VI.   Remand is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

---

[5] In light of the above review, and the resulting need for remand of this case, an analysis of the parties' remaining arguments about the combined impact of Bilbrey's impairments, is unwarranted.

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Bilbrey, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above. On remand the ALJ should be directed to (1) evaluate all the medical source opinions of record under the legal criteria applicable under the Commissioner's Regulations and Rulings and as mandated by case law; and (2) review Bilbrey's disability claim under the required five-step sequential analysis to determine anew whether he was under a disability and thus eligible for Disability Insurance Benefits and/or Supplemental Security Income.

**IT IS THEREFORE RECOMMENDED THAT:**

1.   The Commissioner's non-disability finding be vacated;

2.   No finding be made as to whether Plaintiff Aaron Bilbrey was under a "disability" within the meaning of the Social Security Act;

3.   This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.   The case be terminated on the docket of this Court.


November 21, 2013


                        s/Sharon L. Ovington
                      Sharon L. Ovington
                Chief United States Magistrate Judge

26

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).